IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ASHLEY PRUNTY,

        Plaintiff,

vs.                                           CASE NO. 1:13-cv-254-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") determining that Plaintiff, who had received supplemental security income benefits (SSI) benefits based on childhood disability stemming from a communication disorder, was no longer disabled.  (Doc. 1).   The Commissioner has answered (Doc. 8), and both parties have filed briefs outlining their respective positions. (Docs. 11 and 12.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On June 17, 2011, after Plaintiff reached age 18, her eligibility for benefits was redetermined under the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), pursuant to the rules governing disability in adults.  (R. 11, 86-89.) This determination was upheld upon reconsideration.  (R. 92-103.)  Plaintiff requested a hearing before an ALJ,  which was held on June 28, 2012.  (R. 32-81, 109-12.)  Plaintiff and her mother appeared and testified.  (R. 32-81.)  On July 16, 2012, the ALJ

determined that while Plaintiff has the severe impairments of neurofibromatosis;

borderline intellectual functioning; asthma; and mild rotoscoliosis and straightening of

lumbar lordosis, she does not have an impairment or combination of impairments that

meets or medically equals the listings.   (R. 13.)   The ALJ concluded that Plaintiff

retains the residual functional capacity for light work with certain exertional and

nonexertional limitations.  *Id*.

The Appeals Council denied Plaintiff's request for review.  (R. 1-6).  The instant

appeal followed.  Plaintiff raises two issues for review: (1) whether the ALJ failed to fully

and fairly develop the record because she failed to consult a medical expert regarding

Plaintiff's IQ scores; and (2) whether substantial evidence supports the ALJ's decision

that Plaintiff is not disabled pursuant to Listing 12.05C for disability based on mental

retardation.   Doc. 21.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the district court with

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment that can be

expected to result in death, or has lasted or can be expected to last for a continuous

period of not less than twelve months.[6]  The impairment must be severe, making

Plaintiff unable to do his previous work, or any other substantial gainful activity which

exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[8]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

currently exists in the national economy.[9]  The Commissioner may satisfy this burden

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

exertion."[11]  In a situation where both exertional and non-exertional impairments are

found, the ALJ is obligated to make specific findings as to whether they preclude a wide

range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so

long as he introduces independent evidence of the existence of jobs in the national

economy that the claimant can perform.[13]  Such independent evidence may be

introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive

---

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

means of introducing such evidence.[14]  Only after the Commissioner meets this burden

does the burden shift back to the claimant to show that he or she is not capable of

performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A. Educational and Medical History

Because the issues on appeal pertain to Plaintiff's intellectual functioning, only

the records relevant to those issues are summarized.  Plaintiff was administered the

Wechsler Intelligence Scales for Children III (WISC-III) in January 2004 when she was

in sixth grade.  Her Verbal score was 71, her Performance score was 94, and her Full

Scale score was 80+/-5.  Plaintiff's evaluation reflected a history of underachievement

in school performance.  She was assessed as having an information processing

condition that interfered with acquisition, organization, storage, manipulation, or

expression of information.  The evaluator concluded that she had a need for academic

services in reading, writing, and math.  She demonstrated a language disorder.  The

evaluation notes Plaintiff's medical history of neurofibromatosis type 1, which is

associated with developmental concerns such as learning difficulties, hearing or visual

impairment, speech problems, and motor challenges.  Plaintiff continued to "have a

disability and demonstrate a need for special education service."  (R. 184-91.)

Ronald L. Odden, M.S., a consultative psychologist, administrated the Wechsler

Adult Intelligence Scale (WAIS) IV IQ test on November 19, 2009, when Plaintiff was 17

years old.  Plaintiff's Verbal Comprehension score was 70, her Perceptual Reasoning

---

[14] *See id.*

Index score was 84, and her Full Scale IQ score was 77.  Mr. Odden assessed that

Plaintiff was in the borderline intellectual functioning range of intelligence.  Plaintiff also

met the criteria for attention deficit hyperactivity disorder (ADHD), reading disorder,

disorder of written expression, and neurofibromatosis.  Mr. Odden opined that Plaintiff's

history of attention and learning problems were probably secondary to having

neurofibromatosis.  In the area of developmental/adaptive skills, Mr. Odden stated that

Plaintiff shows "low average" self-help skills compared to her age group.  Plaintiff

performed all self care such as bathing, dressing, and feeding, drove a car with minimal

supervision, cooked simple meals and did housework.  She did not handle money

adequately, and was assessed as below average in social/emotional skills.  Mr. Odden

recommended treatment with medication to address attention in order to help Plaintiff

fulfill her plan to attend college.  She would need support resources on campus, and

would benefit from psychotherapy focused on social problem solving skills and impulse

control as well as social skills therapy.  (R. 277-80.)

A January 2010 Evaluation Report from Dilworth-Glyndon-Felton Senior High

School reflects the following.  In December 2009, Plaintiff completed WAIS-III with her

school psychologist Carol Rogue.  Plaintiff's Verbal score was 79, her Performance

score was 87, and her Full Scale score was 8I.   (R. 222.)

The evaluation notes that Plaintiff expressed interest in various career areas and

was taking a seminar in Employability Skills, in which she had a 76% average.  Plaintiff

had begun working part-time at a McDonald's in June 2008, and got along with her

supervisors and coworkers.  The assessment reflects that "McDonald's was pleased

with her overall work performance especially her customer service skills," and that

Plaintiff would be able to train in other areas if she continued employment after high school graduation.  Plaintiff also was involved in a "Class Projects" program focused on planning the annual class trip as well as work on current events, home living skills, and social skills.  Plaintiff participated in community volunteer activities, and was "very involved in all class discussions and activities," with a score of 86%.  Plaintiff took a regular education class that was responsible for the school's retail store, in which she received para assistance to help with reading and assignments.  Classroom observation reports reflect that Plaintiff could be off-task for significant periods, and was not disruptive but required redirection during class periods.  Plaintiff was found to be eligible for ongoing special education and related services.  (R. 222-28.)

Plaintiff attended therapy at Lakeland Mental Health Center from June 24 to October 25, 2010.  She started business school at Rasmussen College but subsequently withdrew because she struggled with the work.  Plaintiff helped with her family's farm, babysat her sister's children, and worked at McDonald's part-time.  (R. 282-96.)

Plaintiff underwent a second consultative psychological evaluation with Mr. Odden in May 2011.  Her verbal skills were below average and stream of consciousness was spontaneous but lacked complexity.  She had difficulty comprehending some questions but remained coherent during the interview.  There was no evidence of  psychomotor agitation or retardation.  Plaintiff was oriented with a below average attention span.  Her remote memory was low average, and her judgment and insight were below average.  Mr. Odden noted that her IQ had been found to be in the borderline intellectual functioning range.   He assessed ADHD, reading disorder,

disorder of written expression, borderline intellectual functioning, and neurofibromatosis.  He concluded that Plaintiff was able to understand and remember, but sometimes had difficulty following instructions for tasks with two steps and had difficulty focusing for more than 45 to 60 minutes at a time.  Her pace was below average and she completed only a few tasks on a given day, unless supervised.  She would have no difficulty working with coworkers and supervisors, but the stress of an entry-level job would cause Plaintiff some increased frustration.   (R. 336-39.)

On June 16, 2011, state agency psychologist Thomas L. Kuhlman, Ph.D., L.P., completed a psychiatric review technique and mental residual functional capacity assessment.  He opined that Plaintiff retained the mental capacity to carry out routine, repetitive instructions, and that her ability to handle co-worker and public contact, supervision, and stress would be reduced, but adequate.  (R. 346-63.)

On June 17, 2011, state agency physician Jeffrey D. Gorman, M.D., opined that Plaintiff's physical impairments of neurofibromatosis and headaches were not severe. (R. 343-45.)

**B. Hearing Testimony**

At the time of the June 2012 hearing, Plaintiff was 19 years old.  She graduated from high school in 2010, and all of her classes were special education.  Plaintiff testified that she reads at a kindergarten level and has difficulty with arithmetic.  She denied that she could manage her own money or make change.  She last worked two years previously at McDonald's cleaning the lobby and doing dishes, and only worked one hour per day five days a week.  Plaintiff testified that she left the job because the heat while washing dishes was too much for her.  Plaintiff testified that she was unable

to work because she was forgetful.  Plaintiff could not explain why she was unable to do the work at McDonald's that she had done previously.  Plaintiff was able to dress, groom, and bathe, though she needed to be reminded to shower, clean her room, and do chores.  Her household chores included cleaning the kitchen, laundry, sweeping and mopping.  She vacuums when reminded to do so.  Plaintiff sometimes cooks and cares for her dog.  She has a driver's license and drives by herself.  Plaintiff takes medication that helps her memory and staying on task, and she has no side effects.  Plaintiff sometimes go to the library to watch movies and videos on the computers.  She does not have social activities, but she does not have a problem getting along with people.  Plaintiff plays videogames and has a Facebook account, but she denied being able to update her profile or post pictures.  She enjoys working with horses.  Plaintiff babysits her sister's children for short periods of time.

Plaintiff's mother testified that she had to constantly remind Plaintiff to do chores and self-care, such as showering and brushing her teeth.  Plaintiff was unable to live independently because of her medical needs and forgetfulness.  She did not have concerns about Plaintiff driving herself because knew where Plaintiff was going. Plaintiff drove herself to dog obedience school for a therapy dog class, to Barnes and Noble, and to WalMart and the mall.

The ALJ posed the following hypothetical to a vocational expert: an individual of Plaintiff's age, education, and vocational background, who could not work in exposure to extreme heat or pulmonary irritants, and who could perform simple, routine, repetitive tasks; maintain concentration, pace and persistence for two-hour periods; with brief and superficial interaction with coworkers and the public; and receiving instructions in oral

form.  The VE testified that such an individual could perform work that existed in significant numbers in the national economy such as assembler of small products, inspector, and hand packager.  (R. 34-81.)

## IV.  DISCUSSION

The Court will address Plaintiff's second issue first.  Plaintiff argues that the ALJ erred at step three by not finding that Plaintiff's Verbal IQ score of 70, together with her additional severe physical impairments, meets the requirements of Listing 12.05C. Doc. 11.

The listing for mental retardation in Listing 12.05 requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[15]  The diagnostic description states that an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e*., the evidence demonstrates or supports onset of the impairment before age 22."[16]   Subaverage general intellectual functioning refers to an IQ of about 70 or below on various standardized intelligence tests.[17]

---

[15]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

[16]  Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[17]  DSM-IV at 42.

Listing 12.05C requires that the claimant have a "valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation or function."[18]

In finding that Plaintiff did not meet the listing requirements, the ALJ observed that Plaintiff's November 2009 WAIS-IV Verbal score was 70, while her December 2009 WAIS-III Verbal score was 79.  The ALJ concluded that the 9-point deviation "cast some doubt" on the validity of the earlier test.  The ALJ then found that "[n]evertheless, *even accepting this lowest score of 70 as valid*, the record does not support a finding of deficits in adaptive functioning as required for listing 12.05."  (R. 17) (emphasis added).

The ALJ thus assumed that Plaintiff's WAIS-IV Verbal score of 70 satisfied Listing 12.05C.  However, IQ alone is not enough to determine mental retardation because "[i]mpairments in adaptive functioning, rather than low IQ, are usually the presenting symptoms in individuals with Mental Retardation."[19]  While the IQ often remains stable, adaptive functioning can improve with training,[20] and therefore a valid IQ score is not enough to determine if someone is mentally retarded.[21]  Accordingly, the primary issue, as the ALJ recognized, is whether Plaintiff has the requisite deficits in adaptive functioning to meet the requirements of Listing 12.05C.

As support for the conclusion that Plaintiff did not demonstrate deficits in

---

[18]   20 C.F.R. Part 404, App. 1, Subpart P, 12.05C.

[19]   <u>DSM-IV</u> at 42.

[20]   <u>Id.</u>

[21]   "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."  <u>See</u> <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986)).

adaptive functioning, the ALJ pointed to Mr. Odden's rating of Plaintiff's self-help skills as only "low average" for her age group; Plaintiff's reports that she was able to bathe, dress, and feed herself independently; her ability to drive with minimal supervision and no difficulty navigating; her ability to cook simple meals and perform household chores; her ability to care for her dog and babysit two children for 1-1.5 hours at a time. *Id*. Each of these conclusions is supported by substantial evidence in the record, as summarized above.

Plaintiff's first issue asserts that the ALJ had a duty to call and question a medical expert in order to fully and fairly develop the record regarding whether Plaintiff has a Verbal IQ score of 70.  Doc. 11.  There is no question "[t]hat the ALJ has a basic duty to develop a full and fair record."[22]  As a Social Security administrative hearing is non-adversarial in nature,[23] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[24]  An ALJ, however, "is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."[25]

Plaintiff's argument must be rejected because it is patently clear from the ALJ's

---

[22]  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003);  20 C.F.R. § 416.912(d) ("Before we make a determination that you are disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").

[23]  Id.

[24]  See Mason v. Barnhart, 63 Fed. Appx. 284, 287 (9th Cir. 2003).

[25]  Ingram v. Comm'r Social Secur. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007); see also Outlaw v. Barnhart, 197 Fed. Appx. 825, 828 (11th Cir. 2006)(*per curiam*)(noting that "the ALJ may order a physical or mental examination of a claimant at the government's expense; but the ALJ is not required to order an examination if it is not necessary to enable the ALJ to make a disability determination.").

decision that the ALJ assumed for purposes of his analysis that Plaintiff had a Verbal

IQ score of 70.  *See* R. 17.  Because the ALJ made that assumption, there was no

reason for the ALJ to order a consultative examination in order to make an informed

decision.

In sum, substantial evidence supports the ALJ's conclusion that Plaintiff was not

disabled pursuant to Listing 12.05C because the record did not demonstrate that

Plaintiff has deficits in adaptive functioning.  The record was sufficiently developed for

the ALJ to make an informed decision regarding Plaintiff's IQ scores.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED.**

**IN CHAMBERS** in Gainesville, Florida, this 9th day of February 2015.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.